IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

JOHN D. IRVINE,                    )
                                   )
            Plaintiff,             )
                                   )
      v.                           )  Case No.
                                   )  07-3403-CV-SJ-REL-SSA
MICHAEL J. ASTRUE, Commissioner    )
of Social Security,                )
                                   )
            Defendant.             )

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff John Irvine seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title II of the Social Security Act ("the Act"). Plaintiff argues that (1) the ALJ failed to perform the function-by-function analysis of plaintiff's exertional capacities as required by SSR 96-8p, and (2) the ALJ's residual functional capacity assessment is vague in that it does not provide the intervals by which plaintiff must alternate sitting and standing. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

*I.    BACKGROUND*

On June 14, 2005, plaintiff applied for disability benefits alleging that he had been disabled since April 4, 2005.

Plaintiff's disability stems from pain due to fused bones in his neck. Plaintiff's application was denied on August 31, 2005. On March 14, 2007, a hearing was held before Administrative Law Judge Guy E. Taylor. On May 9, 2007, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On October 15, 2007, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into

consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." <u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other

3

type of substantial gainful activity in the national economy that the plaintiff can perform. <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, <u>et seq.</u> The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes = go to next step where burden shifts to Commissioner.

4

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Janice Hastert, in addition to documentary evidence admitted at the hearing.

## A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record establishes that plaintiff earned the following income from 1974 through 2007:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1974 | $ 1,591.96 | 1991 | $14,302.50 |
| 1975 | 3,825.96 | 1992 | 14,162.27 |
| 1976 | 5,499.53 | 1993 | 13,986.63 |
| 1977 | 6,736.01 | 1994 | 17,556.92 |
| 1978 | 7,798.64 | 1995 | 17,875.75 |
| 1979 | 9,281.05 | 1996 | 15,576.63 |
| 1980 | 3,093.81 | 1997 | 20,931.06 |
| 1981 | 5,632.88 | 1998 | 23,762.97 |
| 1982 | 9,176.68 | 1999 | 25,978.24 |
| 1983 | 9,242.95 | 2000 | 29,120.22 |
| 1984 | 11,284.21 | 2001 | 29,523.75 |
| 1985 | 11,801.49 | 2002 | 15,276.03 |

5

| 1986 | 11,934.28 | 2003 | 29,697.89 |
|------|-----------|------|-----------|
| 1987 | 12,442.43 | 2004 | 28.994.93 |
| 1988 | 13,140.00 | 2005 | 11,025.64 |
| 1989 | 12,997.85 | 2006 | 0.00 |
| 1990 | 14,266.45 | 2007 | 0.00 |

(Tr. at 42-47).

**Function Report**

In a Function Report dated July 5, 2005, plaintiff reported
that he lives with his girl friend (Tr. at 66).  He gets up and
has coffee with his medicine.  At noon he has lunch.  In the
afternoon he goes outside to sit in the sun, goes for a walk, or
reads the paper.  He has dinner around 6:00 p.m. and watches
television for about two hours.  He goes to bed around 11:00 p.m.
(Tr. at 66).  He can dress and bathe himself, he can wash his own
hair, he can shave, and he can feed himself (Tr. at 67).
Plaintiff prepares sandwiches, does dishes, and takes the trash
out (Tr. at 68).  Plaintiff goes outside "a lot every day" (Tr.
at 69).  He walks, drives a car, and rides in a car, and he is
able to go out alone (Tr. at 69).  He is able to shop for
groceries once a week for about an hour (Tr. at 69).  He goes to
his daughter's house to visit for about two hours at a time and
goes to his parents' house to visit (Tr. at 70).

Plaintiff reported that he experiences difficulties with
lifting, squatting, bending, reaching, sitting, kneeling, memory,

Case 5:07-cv-03403-REL   Document 17   Filed 10/27/08   Page 6 of 29

and concentration (Tr. at 71). He can lift 15 to 20 pounds but it puts pressure on his neck. Squatting, bending, reaching, and kneeling put stress on his neck. He believes his memory and concentration are impaired due to his medication (Tr. at 71). When asked how far he could walk before needing to rest, plaintiff wrote, "none". He is right handed (Tr. at 71).

**Claimant Questionnaire Supplement**

In a Claimant Questionnaire Supplement dated July 5, 2005, plaintiff stated that he tries to walk as much as he can (Tr. at 79). He walks about three blocks. He can sit for 30 to 45 minutes at a time. He can stand about one hour. He can walk three to four blocks. He can bend for 30 to 45 minutes. He can kneel or squat for about 30 minutes. When he tries to climb stairs it "feels like my head is heavy". His arms cramp when he reaches forward, backward, or overhead.

**School Records**

Plaintiff's school records establish that he got all F's and one I (the equivalent of a D) in 9th grade (Tr. at 100). In 8th grade, he got all I's and M's (the equivalent of a C).

**B.   *SUMMARY OF MEDICAL RECORDS***

Most of plaintiff's medical records are dated prior to his alleged onset date.

Case 5:07-cv-03403-REL   Document 17   Filed 10/27/08   Page 7 of 29

On June 18, 2002, plaintiff underwent a C5-C6, C6-C7 anterior cervical discectomy and fusion[1] and allograft and anterior plate fixation performed by John Olson, M.D., due to disc herniation[2] (Tr. at 108-111).

Two years later, on June 30, 2004, plaintiff underwent a left shoulder arthroscopy, superior labrum repair, subacromial open left distal clavicle excision performed by Thomas DiStefano, M.D. (Tr. at 181-183).

On July 8, 2004, plaintiff saw Dr. DiStefano for a follow up (Tr. at 194, 208). Plaintiff's stitches were removed. He was told to begin physical therapy on July 14, 2004, discontinue using his shoulder immobilizer during the day, and do home exercises twice a day. Plaintiff was taking Percocet (narcotic),

---

[1]Anterior cervical discectomy with fusion is an operation that involves relieving the pressure placed on nerve roots and/or the spinal cord by a herniated disc or bone spurs - a condition referred to as nerve root compression. Through a small incision made near the front of the neck (i.e., the anterior cervical spine), the surgeon removes the intervertebral disc to access the compressed neural structures, relieves the pressure by removing the source of the compression, places a bone graft between the adjacent vertebrae, and in some cases implants a small metal plate to stabilize the spine while it heals. Discectomy involves removing all or part of an intervertebral disc. Spinal fusion involves placing bone graft between two or more opposing vertebrae to promote bone growth between the vertebral bodies.

[2]Pain in the neck and extremities, among other symptoms, may occur when an intervertebral disc herniates - when the annulus fibrosus (tough, outer ring) of the disc tears and the nucleus pulposus (soft, jelly-like center) squeezes out and places pressure on neural structures, such as nerve roots or the spinal cord.

Valium (used to treat anxiety), and Celebrex (non-steroidal anti-inflammatory). "Patient may be able to go back to work with the restrictions starting 7/12/04 with no use of the left upper extremity."

On July 29, 2004, plaintiff saw Dr. DiStefano for a follow up (Tr. at 192, 207). He told plaintiff to continue exercising and using ice and to discontinuing using his shoulder immobilizer. He restricting plaintiff to no lifting or pulling above shoulder level and no lifting more than five pounds. Plaintiff was taking Percocet[3] (narcotic) for pain.

On August 19, 2004, plaintiff saw Dr. DiStefano for a follow up (Tr. at 191, 206). "Patient states he fell three weeks[4] ago and used that arm to catch himself. Says his shoulder popped. Says he has been having some sharp pain and burning pain. We gave him a large steroid injection today to kind of settle that down." Dr. DiStefano told plaintiff to use ice twice a day, continue using anti-inflammatory medicine, exercise twice a day, and to restrict his working to lifting no more than ten pounds and no overhead working, lifting, or pulling.

---

[3]The last prescription for Percocet is dated July 12, 2004, with no refills (Tr. at 193).

[4]Three weeks ago was July 29, 2004, the day of plaintiff's last follow-up visit with Dr. DiStefano.

9

On September 7, 2004, plaintiff saw Sharon Myer, a physical therapist (Tr. at 189). Plaintiff had been restarted on all strength exercises for his shoulder and he was progressing well without return of pain. "John is concerned about return to full duty and potential for injuring the Right shoulder. Would recommend another 2-3 weeks of P.T. [physical therapy] for rehab of L[eft] shoulder. Have discussed seeking other employment for protection of joints and for discontent."

On September 9, 2004, plaintiff saw Dr. DiStefano for a follow up (Tr. at 190, 205). Plaintiff was continued on anti-inflammatory medicine, was told to use ice as needed, exercise twice a day, and until September 27 not to lift more than 15 pounds with his left arm. Plaintiff was released to return to light duty, and was given permission to resume regular duty as of September 27, 2004 (Tr. at 173).

On September 30, 2004, plaintiff was discharged from physical therapy after having participated in 25 visits from July 19, 2004, through September 24, 2004 (Tr. at 187). Physical Therapist Doug Lenner's discharge notes state that plaintiff reported "feeling pretty good and feels confident to do home exercise program after discharge."

On October 7, 2004, plaintiff saw Dr. DiStefano for a follow up (Tr. at 188, 204). Dr. DiStefano told plaintiff to continue

10

using anti-inflammatory medicine, use ice twice a day, and exercise twice a day. Plaintiff was released to return to work full duty with no restrictions (Tr. at 172).

On October 28, 2004, plaintiff saw Dr. DiStefano for a follow up (Tr. at 186, 203). Plaintiff had good range of motion. Dr. DiStafano found that plaintiff had reached maximum medical improvement and found him to have a 12% permanent impairment. He told plaintiff to continue exercising four times per week, use ice as needed, and use over-the-counter Aleve as needed. He found that plaintiff could perform regular duty at work with no restrictions.

On January 24, 2005, plaintiff had a CT scan of his cervical spine, a myelogram of his cervical spine, and CT reconstruction (Tr. at 216-222). Dr. Douglas Goodman found left foraminal narrowing involving the C3-4 and C4-5 disc spaces. "These changes would result in a C4 and C5 radiculopathy." Otherwise, the study was unremarkable with no herniated disc identified.

On March 2, 2005, plaintiff saw Norman Baade, D.O. (Tr. at 227-229). Plaintiff reported continued pain as well as numbness in his thumb and first and second fingers of the left hand. Plaintiff reported spasms and cramping. "Ice along with Valium and Lortab[5] help. Putting his hands above his head and looking

---

[5]Lortab is a narcotic. I have not found any doctor's notes wherein Lortab was prescribed prior to this date.

Case 5:07-cv-03403-REL   Document 17   Filed 10/27/08   Page 11 of 29

up or down increases his pain.  He has difficulty with physical
activity.  Sleep and appetite are not affected."  It was noted
that plaintiff smokes and drinks.  Dr. Baade assessed post
cervical laminectomy syndrome and myofascial disease.  Dr. Baade
told plaintiff to continue taking Lortab up to six per day.  He
discontinued Valium "due to the abuse potential" and prescribed
Skelaxin, a muscle relaxer.  "He does not want to proceed with any
type of injections at this time."  He told plaintiff to come back
in two months.

April 4, 2005, is plaintiff's alleged onset date of
disability.

On April 27, 2005, plaintiff saw Dr. Baade (Tr. at 226).
Plaintiff complained of neck pain and left upper extremity
numbness.  Dr. Baade assessed post-cervical laminectomy syndrome
and myofascial disease.  He put plaintiff on Flexeril instead of
Skelaxin because Flexeril is cheaper.  He continued plaintiff on
Lortab (could increase it to eight per day) and told him to come
back in three months.

On July 22, 2005, plaintiff saw Dr. Baade for reevaluation
(Tr. at 225).  Plaintiff was "75% better."  His pain was in his
left hand.  He was taking Lortab and Flexeril.  "Flexeril is
doing well at this point."  Plaintiff denied any new numbness or
weakness.  Dr. Baade assessed post-cervical laminectomy syndrome.

12

He continued plaintiff on his medications and told him to return in three months.

On October 24, 2005, plaintiff saw Dr. Baade for neck and left arm pain (Tr. at 230). Plaintiff was taking Lortab and Flexeril. Dr. Baade assessed post-cervical laminectomy syndrome. He continued plaintiff on his medications and told him to come back in two months.

On December 20, 2005, plaintiff saw Dr. Baade (Tr. at 236). Plaintiff continued to have numbness in his left arm. Dr. Baade continued plaintiff on his current medications and told him to come back in three months.

On March 21, 2006, plaintiff saw Dr. Baade (Tr. at 235). "He washed the walls recently and states he had increased numbness in his arm." Dr. Baade assessed post-cervical laminectomy syndrome. He continued plaintiff on his same medications and told him to come back in three months.

On June 19, 2006, plaintiff saw Dr. Baade (Tr. at 234). "He is doing well with his extremity pain." He was assessed with post cervical laminectomy syndrome. Dr. Baade told plaintiff to continue his current medications and return in three months.

On September 19, 2006, plaintiff saw Dr. Baade (Tr. at 233). He denied any new numbness or weakness. Dr. Baade assessed post cervical laminectomy syndrome and myofascial disease. He told

Case 5:07-cv-03403-REL   Document 17   Filed 10/27/08   Page 13 of 29

plaintiff to continue his current medications.

On December 18, 2006, plaintiff saw Dr. Baade for neck and arm pain (Tr. at 232). Plaintiff denied any new numbness or weakness. Dr. Baade assessed post cervical laminectomy syndrome. He told plaintiff to continue his current medications and come back in three months.

**C. *SUMMARY OF TESTIMONY***

During the March 14, 2007, hearing, plaintiff testified; and Janice Hastert, a vocational expert, testified at the request of the ALJ.

**1. Plaintiff's testimony.**

At the time of the hearing, plaintiff was 49 years of age (Tr. at 247). He lives in a two-story house with his girl friend (Tr. at 247). Plaintiff's girl friend does not work (Tr. at 253). Plaintiff completed 9th grade in high school (Tr. at 248). He has a valid driver's license and drives almost every day (Tr. at 248). He goes to the store or to see his children (Tr. at 248).

Plaintiff testified he has no income, he gets no food stamps or assistance from anyone (Tr. at 249). He drew out of his 401(k) and is using that (Tr. at 249). He last worked on April 2, 2005, at Laclede Chain (Tr. at 249). He stopped working due to severe pain in his neck and mid-shoulder (Tr. at 249).

14

Plaintiff's 2005 earnings, $11,025, includes his earned income and worker's compensation income which he received at something over $300 per week (Tr. at 250).

Plaintiff had an on-the-job injury in February 2002 and had surgery on June 18, 2002 (Tr. at 251). He had another on-the-job injury in March 2004 and he had surgery in June 2004[6] (Tr. at 250). After each surgery, plaintiff was returned to work (Tr. at 251-252).

Plaintiff continues to experience pain in his neck and left shoulder, and he rated his pain as a four out of ten (Tr. at 252). Plaintiff takes Lortab and Flexeril every day (Tr. at 252).

Plaintiff typically gets up and takes care of his dog and cat, makes coffee and drinks that, then does the dishes from the day before (Tr. at 253). He likes to cook and keep the bathroom clean (Tr. at 253). He does not do any yard work (Tr. at 253). In the summer, he goes out every day and walks around in the yard (Tr. at 253). He can walk several blocks if he is not in a hurry (Tr. at 253). He has trouble reaching into a cabinet with his left arm (Tr. at 254). He can reach in all directions if he does it slowly (Tr. at 258). He can pick up a pen or pencil, and he

_____

[6]The transcript says plaintiff had surgery in June 2005; however, because the medical records show his surgery was in June 2004, I will assume that is a typographical error.

15

can pick up a cup of coffee if he does not have to reach for it
quickly (Tr. at 254). Plaintiff smokes about a pack and a half
of cigarettes per day (Tr. at 255). He climbs the stairs in his
house but cannot climb a ladder (Tr. at 255). Plaintiff's
medication makes him get dizzy if he bends over to pick something
up (Tr. at 255). Plaintiff can pick up a 24-pack of soda with
his right hand (Tr. at 255).

Plaintiff took Xanax briefly for depression after he lost
his job, but he "toughed it out" and is better now (Tr. at 256).
Plaintiff has problems with memory and concentration, probably
because of his medicine (Tr. at 257). Plaintiff described
forgetting to put his tools away after he fixed the toilet the
day before (Tr. at 257).

Plaintiff uses ice on his neck and shoulder about three or
four times per week for 15 to 20 minutes (Tr. at 258). He sits
in a recliner with a neck pillow every day for a couple of hours
(Tr. at 259-260). Plaintiff could not perform a job where he had
to keep his head stationary because of the pain (Tr. at 260).
Plaintiff could sit in a straight-back chair for up to 30 minutes
(Tr. at 261). Plaintiff has never been told by a doctor that he
should lie down during the day (Tr. at 261).

16

2. **Vocational expert testimony.**

Vocational expert Janice Hastert testified at the request of the Administrative Law Judge. Plaintiff's previous work history includes working as a tire or production welder, medium unskilled, and a tire repairer, heavy semi-skilled (Tr. at 263).

The first hypothetical involved a person who could do no more than light work, lifting and carrying 20 pounds occasionally and ten pounds frequently, could stand and walk six hours per day, could sit for six hours per day, could push and pull without limitation with all extremities except the left arm, would have a limited ability to reach above shoulder height with the left arm, could not use ladders, could only occasionally balance, and would need to avoid concentrated exposure to vibration and hazards (Tr. at 263-264). The vocational expert testified that such a person could not perform plaintiff's past relevant work (Tr. at 264). However, the person could work as a microfilm processor with 300 jobs in Missouri and 13,000 in the nation; a photocopy machine operator, with 400 in Missouri and 19,900 in the nation; or a sales attendant with 2,200[7] in Missouri and 80,000 in the nation

_____

[7]The transcript says 200 in Missouri; however, the ALJ recited the vocational expert's testimony in his order and said there were 2,200 sales attendant jobs in Missouri. Given the ratio of the jobs in the state versus the country, it seems that with 80,000 jobs in the country, there would be more than 200 of those jobs in Missouri. I will assume this is another typographical error.

(Tr. at 264).

The second hypothetical involved the same limitations as those described above but the person would also suffer from short-term memory loss and therefore would be limited to performing only simple, unskilled, repetitive tasks, and the person would need to have a sit/stand option (Tr. at 264). The vocational expert testified that the additional limitations would not preclude the person from performing the three jobs described above (Tr. at 264-265).

The vocational expert's testimony is consistent with the Dictionary of Occupational Titles with the exception of the sit/stand option which comes from her experience in evaluating work settings (Tr. at 265).

The next hypothetical again built on the second one but also required that the sit/stand option be at will and that the person be limited to no more than occasional reaching in any direction with the left, non-dominant hand (Tr. at 265-266). The vocational expert testified that the person could still perform those three jobs (Tr. at 266).

The vocational expert testified that frequent reaching, handling, and fingering do not mean bilateral reaching, handing, and fingering (Tr. at 267). For example, a microfilm processor could reach with the dominant hand and use the non-dominant hand

18

as a holding device or guidance device (Tr. at 267). There is no requirement that the worker have a good bilateral hand function on these jobs (Tr. at 267). This opinion is based on the vocational expert's experience in evaluating the placement of people in these types of jobs (Tr. at 267).

The next hypothetical involved a person limited to sedentary work with a sit/stand option at will and the same reaching restrictions as listed above (Tr. at 267). The vocational expert testified that the person could work as a security systems monitor, which does not require any reaching, handling, or fingering (Tr. at 267-268). A security systems monitor observes a bank of TVs and watches the activities going on in an environment and alerts security or an outside police force if there is a problem (Tr. at 268-269). There are approximately 2,000 of these jobs in Missouri and 100,000 in the nation (Tr. at 269). The person could also work as a credit checker which requires occasional reaching, handling, and fingering (Tr. at 268). The person could be a telephone solicitor which requires occasional reaching and handling and frequent keying or fingering (Tr. at 268). The person could also be a semi-conductor/bonder which requires occasional reaching and frequent handling and fingering (Tr. at 268).

19

Finally, the vocational expert was asked whether, in an unskilled light or sedentary job, if the person needed to take more than the normal breaks allowed, the person could perform substantial gainful activity (Tr. at 270). The vocational expert testified that the person could not (Tr. at 270). She also testified that if the person had to miss two or more days of work per month, he or she would not be able to work (Tr. at 270).

## V. FINDINGS OF THE ALJ

Administrative Law Judge Guy Taylor entered his opinion on May 9, 2007.

Step one. The ALJ found that plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 14).

Step two. He found that plaintiff suffers from the following severe impairments: degenerative disc disease of the cervical spine, status post C5-6 and C6-7 anterior cervical discectomy and fusion in June 2002, with history of cervical pain; myofascial disease; and degenerative joint disease of the left acromioclavicular joint with left shoulder impingement syndrome, status post left shoulder arthroscopy, subacromial decompression and open left distal clavicle excision in June 2004, with history of left shoulder pain (Tr. at 14). The ALJ found that plaintiff's depressive symptoms had resolved and are

20

therefore not severe (Tr. at 14). He found that plaintiff's abdominal hernia is a non-medically determinable impairment (Tr. at 14).

Step three. The ALJ found that plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14).

Step four. The ALJ found that plaintiff retains the residual functional capacity to perform the full range of light work except that pushing and pulling would be limited with respect to plaintiff's left non-dominant upper extremity, and he would not be able to reach above shoulder level with the left upper extremity. He could only occasionally reach in either direction with the non-dominant left upper extremity. Climbing of ladders, ropes and scaffolds would be contraindicated, albeit plaintiff could occasionally balance. There should be no exposure to vibration or working at unprotected heights or around dangerous, moving machinery. Plaintiff should be afforded a sit/stand option (Tr. at 17). With this residual functional capacity, plaintiff is unable to return to his past relevant work (Tr. at 17).

Step five. The ALJ found that plaintiff could perform other jobs available in significant numbers in the economy such as microfilm processor with 300 jobs in Missouri and 13,000 in the country, photocopy machine operator with 400 jobs in Missouri and

21

19,900 in the country, or sales attendant with 2,200 jobs in
Missouri and 80,000 in the country (Tr. at 17-18).

## VI. *SOCIAL SECURITY RULING 96-8P*

Plaintiff argues that the ALJ erred in formulating a
residual functional capacity without first identifying
plaintiff's functional limitations or restrictions and assessing
plaintiff's work-related abilities on a function-by-function
basis, as required by SSR 96-8p. However, plaintiff never
identifies what functions the ALJ erroneously found plaintiff
could do.

Social Security Rule 96-8p states in part as follows:

> 4. The RFC assessment must first identify the
> individual's functional limitations or restrictions and
> assess his or her work-related abilities on a function-by-
> function basis, including the functions in paragraphs (b),
> (c), and (d) of 20 CFR 404.1545[8] and 416.945. Only after

---

[8](b) Physical abilities. When we assess your physical
abilities, we first assess the nature and extent of your physical
limitations and then determine your residual functional capacity
for work activity on a regular and continuing basis. A limited
ability to perform certain physical demands of work activity,
such as sitting, standing, walking, lifting, carrying, pushing,
pulling, or other physical functions (including manipulative or
postural functions, such as reaching, handling, stooping or
crouching), may reduce your ability to do past work and other work.
(c) Mental abilities. When we assess your mental abilities,
we first assess the nature and extent of your mental limitations
and restrictions and then determine your residual functional
capacity for work activity on a regular and continuing basis. A
limited ability to carry out certain mental activities, such as
limitations in understanding, remembering, and carrying out
instructions, and in responding appropriately to supervision, co-
workers, and work pressures in a work setting, may reduce your

22

that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

In addition to the above, however, paragraph 3 of SSR 96-8p reads as follows:

> 3.  When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity.

Plaintiff does not identify which abilities the ALJ erroneously found he could do.  However, a review of the record establishes that plaintiff did not complain -- either in his administrative documents connected with his disability application or in any medical records -- about an inability to stand, walk, push, pull, or carry.  He reported that he can wash his own hair, which clearly requires him to reach above his head; he said he can sit for 30 to 45 minutes at a time and stand for one hour at a time; he can shop for an hour; he can lift 15 to 20 pounds; he can bend for 30 to 45 minutes at a time; he can kneel or squat for about 30 minutes.  After plaintiff's most recent

---

ability to do past work and other work.
    (d) Other abilities affected by impairment(s). Some medically determinable impairment(s), such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions, may cause limitations and restrictions which affect other work-related abilities. If you have this type of impairment(s), we consider any resulting limitations and restrictions which may reduce your ability to do past work and other work in deciding your residual functional capacity.

Case 5:07-cv-03403-REL   Document 17   Filed 10/27/08   Page 23 of 29

surgery, he was released to return to work with no restrictions. He told his physical therapist that he was concerned about returning to work on full duty because he was afraid of injuring his right shoulder (his surgery was on his left shoulder). The physical therapist told plaintiff he should consider seeking other employment "for protection of joints and for discontent."

Plaintiff was released to return to work with no restrictions the end of September 2004. Plaintiff did return to work and worked until the beginning of April 2005 -- six months -- with no medical restrictions. The only doctor plaintiff has seen since his alleged onset date is Dr. Baade. Plaintiff told Dr. Baade during his initial appointment that putting his hands above his head and looking up or down increases his pain. He never complained of any difficulty with sitting, standing, walking, pushing, pulling, lifting, or carrying. During plaintiff's treatment with Dr. Baade, he saw the doctor once every three months, he complained of nothing other than neck pain and left arm numbness, and the doctor kept plaintiff on the same medications from March 2, 2005, through the last appointment in the record, December 18, 2006 (with the exception of changing from one muscle relaxer to another due to cost). This indicates that plaintiff's treating physician believed the medication was adequately controlling plaintiff's symptoms. In fact, Dr.

24

Baade's records include the following notation: "He is doing well with his extremity pain."

Dr. Baade never restricted any of plaintiff's activities. In fact, during one visit plaintiff reported that he had been washing walls, and Dr. Baade did not recommend that plaintiff limit that kind of physical activity. There simply is no evidence whatsoever that plaintiff ever complained to any doctor about any difficulty with sitting, standing, walking, lifting, carrying, pushing or pulling, nor did any doctor ever recommend that plaintiff limit any of these activities after his alleged onset date. When the record establishes that no examining doctor has ever placed functional restrictions on the claimant, a finding of disability is not justified. Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir. 2003); Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993).

The ALJ found that plaintiff was limited to light work. Light work requires

> lifting no more than 20 pounds at a time with frequent
> lifting or carrying of objects weighing up to 10 pounds.
> Even though the weight lifted may be very little, a job is
> in this category when it requires a good deal of walking or
> standing, or when it involves sitting most of the time with
> some pushing and pulling of arm or leg controls. To be
> considered capable of performing a full or wide range of
> light work, you must have the ability to do substantially
> all of these activities. If someone can do light work, we
> determine that he or she can also do sedentary work, unless
> there are additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567.

The ALJ further limited plaintiff's RFC by limiting the pushing, pulling, and reaching he could do with his left arm (non-dominant). He limited plaintiff to a sit/stand option even though there is absolutely no evidence in the record that this is required, and even though he found that plaintiff's subjective complaints were not credible. Therefore, I find that the ALJ gave plaintiff the benefit of the doubt with respect to this limitation.

The ALJ's failure to specifically find that plaintiff has no limitation in his ability to sit, stand, or walk is not fatal to his opinion. As mentioned above, paragraph 3 of SSR 96-8p states that when there is no allegation of a physical limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity. Because plaintiff did not complain of a limitation of these abilities in his disability paperwork, never complained of any limitation of these abilities to any treating doctor, and no doctor ever restricted any of these abilities, I find that the ALJ did not err in failing to specifically state in the record

26

that plaintiff is not limited in his ability to walk, stand, or sit.[9]

## VII. SIT/STAND OPTION

Plaintiff next argues that the ALJ's RFC is vague in that it does not provide the intervals by which plaintiff must alternate sitting and standing. In support he cites to "Johnson v. Bernhart" [sic], a case which was before Judge Howard Sachs in the Western District of Missouri, without providing the case number or even the plaintiff's first name to aid in the search of this opinion. Plaintiff states that the Johnson case cites Stoglin v. Apfel, 130 F. Supp. 2d 1060, 1067 (S.D. Iowa 2000) "where the Court recognized SSR 83-12 from the perspective of professional and managerial jobs allowing a person to sit or stand with a degree of choice, but not unskilled types of jobs." Plaintiff's argument is without merit.

Both plaintiff and the court in Stoglin v. Apfel[10] omitted a portion of SSR 83-12 that is directly relevant here:

> 1.  *Alternate Sitting and Standing*
> In some disability claims, the medical facts lead to an assessment of RFC which compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for time, but must then get up and stand

---

[9]The ALJ did specifically address plaintiff's ability to push, pull, lift, and carry.

[10]The court omitted this portion of SSR 83-12 because it was not relevant to the facts of the Stoglin case.

27

or walk for awhile before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.) There are some jobs in the national economy -- typically professional and managerial ones -- in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. **In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base.**

SSR 83-12 (emphasis added).

The court in <u>Stoglin</u> did not mention this last quoted part because in that case, the vocational specialist had testified that the claimant was capable of performing semi-skilled jobs, although the ALJ had found that the claimant had no transferrable skills. That case did not deal with light exertional unskilled jobs which would allow for a sit-stand option.

In this case, the ALJ clearly gave plaintiff the benefit of the doubt in finding that he required a sit-stand option, as there is no evidence at all that plaintiff is limited in his ability to sit, stand, or walk. In any event, in accordance with SR 83-12, a vocational specialist was consulted to clarify the

Case 5:07-cv-03403-REL   Document 17   Filed 10/27/08   Page 28 of 29

implications for the occupational base.  The vocational expert testified that in her 30 plus years of experience, she knew that the jobs described in her testimony could be done with a sit-stand option wherein the worker could sit or stand at will.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.

*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
October 27, 2008

Case 5:07-cv-03403-REL   Document 17   Filed 10/27/08   Page 29 of 29